in the first case, Brown v. City of New York. Thanks. Good morning, Your Honors. May it please the Court. John Romberg for Seton Hall Law School Center for Social Justice, representing Plaintiff Appellant Margie Brown. I would like to briefly discuss the implications of the procedural posture of the sua sponte dismissal prior to service on defendants, and then focus on the due process questions. And I may briefly address the additional claims, and I'm of course happy to answer any questions the Court has about municipal liability, about supplemental jurisdiction over state law claims, or about the privacy claims, but I'd like to focus on the due process after I mention the procedural posture. The District Court here dismissed sua sponte prior to service on defendants, which this Court has described as a draconian measure, as bad practice, and as improper unless it's unmistakably clear the complaint lacks an arguable basis in fact or law. And that's particularly true when, as here, the plaintiff was a then pro se homeless woman who submitted her complaint. And so that has three implications for this Court's review. First, this Court has the power and should recognize the viable claims Brown stated in her complaint. Second, for any claims for which there's an arguable basis in her complaint, either factually or legally, rather than dismissal prior to service on defendants, this Court should remand for the District Court to allow service on defendants the filing of an answer, and then for the case to proceed in the ordinary course, including a motion to dismiss on the pleadings. And finally, even for claims that lack an arguable basis in fact or law, if there is, as this Court held in Cuoco, any indication that a valid claim might exist, the proper response for the District Court, rather than dismissal without leave to amend, as happened here, is to permit amendment, indeed, to permit amendment as of right in the first instance. So this Court, even if there's no arguable basis, but there's any indication that there might be a valid claim, the proper course is to remand and to permit  Presumably, the District Court will consider appointing pro bono counsel on remand. Let me ask you about, on that issue, the special relationship doctrine. We've said over and over again that if it's not involuntary commitment of some type, that there can't be that special relationship established. You're not, I know you referenced the executive order of trying to encourage homeless to utilize the shelters, but other than this issue about overnight, you're not arguing that your client was forced to go to the shelter, right? That's correct. Amicus New York City has argued that the special relationship requires an involuntary full physical custody, and we've argued that's not true. But as Your Honor points out, we have noted that, in fact, there is a significant degree of control that New York City and its employees through the shelter system exerted over Brown, including requiring her to remain in the shelter after 10 PM when virtually all the attacks occurred, and also under Executive Order 151 when it's at or below 32 degrees. But even more fundamentally, on the due process special relationship, and there's a special relationship and a state enhanced danger, and I'll address both. But on the special relationship, this court specifically held in Society for Government Institution, whether voluntary or involuntary, then the government has a corresponding duty to provide minimally safe circumstances, and not to be conscious, shockingly, deliberately indifferent to danger, a standard that Amicus doesn't even argue is not plausibly presented on the allegations. For Descheny, we have said numerous times since Descheny that the hallmark of a special relationship in these types of contexts is some type of involuntary commitment, right? I disagree, Your Honor. I think that this Court has pointed out that the circumstances in which a special relationship has been found, well, first of all, it includes this. But in Madigan, the involuntary custody is the linchpin of any special relationship exception. Right. That statement occurred in dicta, I believe, describing what had happened previously. But in fact, this Court in Jacobs found there to be a special relationship when someone was on parole and not within physical custody, and in Doe, this Court On parole, the parole officer's kind of in control of your life in many ways. We've recognized that, and we've recognized that as a custodial relationship. She was free to go. She wasn't committed to this institution. I mean, if you've – if this establishes a special relationship, then anyone who makes use of a municipal service and spends a night is suddenly in a special relationship? The Court doesn't need to reach the question of whether or not – Did she enter voluntarily? On these occasions, was she forced into the – other than the 30 – on the – when the temperature was down to 32. In the instances in this 40-page complaint of hers, was she – did she enter voluntarily? I would argue no. She's – You would argue. Why don't you answer? Did – did she enter voluntarily? I will argue no. Did she allege that she entered involuntarily? She was a – the city found her to be chronically homeless and mentally ill, not effectively able to care for herself outside the system. And the – Was she – was she – was she ordered by a state or local court that she was incapable of caring for herself and committed to the custody of the State of New York? No. There was no order – Was she committed to the custody by any judicial administration of the city? No, which is – So how – so how was she – how did she enter the facility, voluntarily or involuntarily? She was not ordered by a court to be there, but neither – Was she free to leave at any time? She was not free to leave between 10 p.m. and 6 a.m., and she was not free to be there when it was – Until 10 p.m., she was free to leave? She was not literally barred by order from leaving, but as – but again, in Jacobs, someone was on parole, and this court held that a special relationship existed. In Doe – Parole is such a different – parole is such a different – look, I know you – I appreciate the fact that you're – you're carrying a pro bono assignment, but I don't think parole is a good analogy for it. So let me move to Doe, foster care. Okay, good. So in Doe, this court held that foster care is a special relationship, even though foster care can be voluntary or involuntary. And this court in Yingjing Jian, following De Cheney, specifically reaffirmed Doe. And moreover, Society for Goodwill specifically holds that even in the absence of a – of an order, that involuntary – if – if the State puts someone into an institution, the – the Society for Goodwill says, and I quote, "...once the State chose to house the voluntary residents, thus making them dependent on the State, it was required to do so in a manner that would not deprive them of constitutional rights, specifically including, quote, insufficient supervision to prevent the residents from being injured by others." So New York City has argued that Society for Goodwill is implicitly constrained to its facts by De Cheney. But this Court has never so held, and the question in this procedural posture I did say in two cases, Brooks v. Giuliani and in Suffolk, parents of handicapped adults versus Wingate, both involving severely disabled individuals that, in light of De Cheney, that they could not bring a due process claim regarding the funding because they were not – the guardians had consented to their being there. Absolutely. As to funding, the holding in Brooks and Suffolk was just because the State had agreed to fund doesn't mean that they were obligated to do so and to continue doing so. So it specifically held when, however, the government disclaims any entitlement to continued funding, which it doesn't do here, and thus ends the funding. The reach of Society for Goodwill is controlled by the Supreme Court's subsequent holding in De Cheney. That's not the question here. Here, the City acknowledges that it will provide that shelter. It voluntarily lets people in. Each of those opinions was the issue of custody or involuntary or not. It wasn't on the issue of the funding itself. Respectfully, Your Honor, it was. There were two issues. The first issue was funding, and on that issue, this Court held there was no right to funding given De Cheney. On the second issue, which was the question of while they were there, was an involuntary transfer permissible, the Court held that due process did apply, but on the facts that preliminary injunction was not required because there wasn't evidence that would be improper. The Court's holding was that there was no obligation to continue funding once the State decided that it would no longer do so. De Cheney says there's no affirmative obligation to provide funding. And I'd like to briefly address the other basis which this Court recognizes, which is the State-enhanced danger, which does not depend on the existence of any kind of restriction of freedom, which we would argue applies here, given the attacks that occurred when she was not permitted to leave the shelter, and also given the fact that she was assigned to a bed and a woman who had threatened to kill her was assigned to a bed next to her, and the shelter officials, the defendants, refused to either move the woman who had threatened to kill her away from her and refused to allow Brown herself to move, therefore providing the kind of involuntary control that distinguishes this case from De Cheney, someone in a private home where the government simply doesn't do anything. Under State-enhanced danger, this Court in Pena and Oken has recognized that the State can contribute to danger when, through repeated inaction in the face of threats to violence, the government communicates to third parties that they will not interfere, that future conduct will go unpunished. And therefore, in Oken, this Court held that repeated sustained inaction by government officials in the face of potential acts of violence might constitute prior assurances rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement, if it's implicit through repeated inaction, not a single instance, but as here, 13 instances of violent attacks. Brown made literally at least 413 complaints about this, and defendants did nothing. They didn't investigate. They didn't punish. They didn't discipline. They didn't protect Brown. They stood by in the face of this continued violence, and as this Court held in Oken, that the plaintiff would be more vulnerable once the third party was aware of the officer's dismissive and indifferent attitude. Roberts. You're out of time. You have some time for rebuttal. We'll hear from the City, and then we'll hear from you again. Thank you. And thanks to the City for coming in as Amika said. Absolutely, Your Honor. Ingrid Gustafson appearing on behalf of the City. At the outset, I do want to emphasize that the City has not been served or appeared in this action. We're really appearing for, have requested permission to appear for a limited purpose, and that is to protect the government's interest in the proper scope of substantive due process claims. The City's position here is really twofold. First, the District Court got it right under very clearly established law. There was no valid claim, even arguably pleaded in the complaint. But to the extent that this Court finds these issues at all arguable, the new arguments that are being raised on appeal, the new allegations, it should remand to the District Court so that the City can be served and that these important issues can be addressed in the usual court, the course of litigation. Nonetheless, the Court absolutely got it right here. The government of the allegations of sustained inaction, allegations of 13 incidents of violent attack, should not the City have done something or the people running the shelters done something about those? As the District Court correctly held, that allegation is absolutely resolved by Dishani. In Dishani, there was also repeated inaction, numerous complaints, visits to the hospital. The City had even, the county there had even intervened in the past and returned the child to the father's care. There was a similar allegation in Dishani. Which was after Dishani where we said repeated, sustained inaction can, even after Dishani, potentially be actionable if it's known and extreme enough and repeated enough. So why isn't there, you know, even if there needed to be an amendment to make more clear that they were aware of this danger, of this individual that they put next to her in the home, threatening her. Why isn't there a potential claim under Okin? In Dishani, the Court did say that knowledge is not enough. Okin and Pena, which are the two cases that plaintiff relies upon, don't actually just stand for the proposition that repeated inaction becomes action. What they say in the passage that my adversary was citing in Okin and that Your Honor is referring to, immediately after that passage, the Court goes on to cite Pena for the proposition that there still needs to be some sort of affirmative conduct. And the reason is because we're dealing with substantive due process, there's no minimum standard of care. There has to be some sort of government oppression, some sort of affirmative act. And in Okin and in Pena, what there was, is there was a personal, specific relationship between the alleged perpetrator of the violence and government officials that, and through that relationship, through specific conduct, condonation and approval of the conduct, was communicated such that the government could be said to increase the danger. As this Court said in Pena, the difference between special relationship and between the state-created danger doctrine is the relationship. It's the relationship with the perpetrator. And here, there is not absolutely... More than negligence. Absolutely, Your Honor. This is a complaint in negligence in a state claim, a government-based claim almost, of negligent supervision or negligent provision of a service. Absolutely, Your Honor. And that's the reason why these rules are so strict in this context, is because we're talking about substantive due process doctrine. We're not talking about a federal tort doctrine. There are... She had alleged... This goes to the issue of whether or not she should be given a chance to amend. If she had known what the basis was for the dismissal and then alleged that they knew this woman, Sophia, the woman who was placed next to her, that they knew about the threats, but affirmatively put her in the bed next to her, why wouldn't that be then potentially in this narrow category that you're articulating? She didn't have a chance to give more facts to try to show that there was this knowledge plus the affirmative act. Really, two reasons, Your Honor. First, when we're talking about the beds in particular, this was on two occasions. And there's no allegation that there was any injury that occurred as a result. In fact, if you look at her allegations of injuries, they all occurred in different rooms, at different times, well before the alleged bed placement. There's no connection in the complaint to an increased danger. And no, Your Honor, simply pleading that the city was aware would not be enough. In every one of this Court's cases, it has required some form of affirmative conduct, some sort of relationship with the perpetrator, such that there was encouragement or condonement. There is no allegation in this complaint that there was any interaction between any of the shelter staff or city employees and the perpetrators or that the perpetrators would have been aware of any condonation. In Coleman, this Court dismissed the complaint because there was no allegation, no evidence, that the perpetrator, even though the police had had repeated interactions with the perpetrator, was aware of any kind of condonation. Simple repeated inaction is exactly what there was in Deshani. And it would be inconsistent with Deshani to say that repeated inaction becomes an affirmative act. It wouldn't meet the requirements of the Due Process Clause and it would basically swallow the rule. We have a special relationship. Absolutely. Assuming we agree that if it's voluntary, substantive process can't create this special relationship. Absolutely. I know it's not in the current complaint, but they do allege that at a minimum, that overnight you cannot leave the shelter. You're involuntarily from 10 p.m. to 6 a.m., whatever it is. So why isn't that potentially something, again, that could have been amended to create a potential special relationship? Two important reasons, Your Honor. First, it's just inaccurate and I would like to clarify the nature of the shelter system. And second, it's not in the complaint. There is no allegation in the complaint of deprivation of liberty. Nothing. No restriction. And I don't understand what the basis for this new allegation would be. As counsel has informed the Court, and in my understanding, although it may have changed, it's still true, they've never been able to contact their client. So I don't see what the basis for this new allegation would be. And it's simply inaccurate. We're talking about adults who are entering the city's shelter system, whether they're mentally ill or not. The only difference in a shelter that is dedicated to the mentally ill is that there are services provided voluntarily to those individuals. Whether you have a mental illness or not, you are never and can never be forced to remain in the shelter. That would be bodily restraint, and you can only do that legally if someone is a danger to themselves or others. The curfew, but I think plaintiff's counsel is just misunderstanding the nature of the weather directive and of the curfew. What the curfew is, is that you're supposed to be in by 10 o'clock in order to secure your bed. And if you're not in by 10 o'clock, then you risk your bed being given to someone who needs it. But if you are in, and you want to leave at 2 a.m., you can. There's nothing stopping you. The city could never lock you in to a shelter. And if you do leave, you can come back the next day and seek another bed in the shelter. It's simply inaccurate that there is any deprivation of liberty that the city is applying here. And the second ground, plaintiff's counsel nonetheless. You mentioned that in your brief, but I don't know if you cite anything. Is there any New York City? Oh, I see, there's an executive order. Oh, the executive order is about the weather. I'm sorry, I meant to get to that. The executive order, what it says is that you have to make efforts to encourage people to enter the shelter, which is what the city does. It sends out city employees. It tries to encourage people to come in. If there are times where a city official may be afraid that someone's life is in danger, but what happens in that circumstance is the police are called. They come and do an evaluation of whether that person is a danger to themselves or others. And then what will likely happen is the person gets taken to the hospital, if that's correct. There's never... There's a process they have to pursue. There's a process. There are regulations. There are rules. There's no, the shelter officials would never be forcing someone in. When it comes to the curfew, yes, the city, I mean, the city hasn't appeared in this action. It didn't put in papers below. We haven't really had the opportunity to clarify. But that argument about the 10 to 6 a.m., I just don't, I also, it wouldn't be reflected anywhere because it's not the city's policy. And because plaintiff, I don't think, I don't see where that allegation would come from if plaintiff's counsel has never spoken to plaintiff. It's not in the complaint and it's simply inaccurate. The Court has no further questions. Thank you very much. We'll hear the rebuttal. So the questions about the 10 p.m. to 6 a.m. restriction come from calling Tillery Shelter, and that's what they told us. Obviously... Wait, wait, wait. And... I'm sorry, but it's not in the complaint. And so then if you're going to assert that it's a matter of law, it's a public policy, I would think you'd look at, you'd have some kind of document or something. Well, we called them after finding it somewhere on the Internet. But the point is, this is not... Doesn't it strike you as perhaps a little bit of far field that the city has the authority to hold someone in a facility when there's no order giving them control over their person? Yes, but this is not... What's your... What would be the legal... What would be the... Excuse me. What would be the legal basis for that? We would challenge that. But this is not... But the question... But you've told us that this is a city policy, so I need to know. I need to know the legal basis that... where the city's... where this comes from. And the city says it doesn't have... doesn't exist. And your response is a telephone call. The question is, is there any indication that an amendment might allow that to be put in? If so, then the case should not be dismissed without leave to amend. The executive order states... Let me ask you. If, say, the rule were... the rule on the door of Tillery House was, if you come in for the night and you're still here at 10 o'clock, you cannot leave. Would that be... Would that create a special relationship? I believe it certainly would contribute to a special relationship. If you entered knowing full well that you couldn't leave after 10 o'clock, was that voluntarily accepting the rules? The question under special relationship is whether there's sufficient control that the city bears responsibility not to be conscious, shockingly indifferent. But I'd like to move to the state-enhanced danger and disagree with the city's statement that this court has required that there be a relationship between the government and the third parties. That's not true. That happened to be the context in Pena and Oken. But Pena and Oken quite plainly do not require that. They say, repeated sustained inaction in the face of repeatedly dangerous conduct can give rise to the possibility of an implicitly sending the message that we're not going to intervene. We'll remove the deterrent effect. Did she allege that she was injured by sleeping next to the person that threatened her? Yes. She alleges that on those two nights, she stayed up all night terrified, which is an injury. Yes, which is an injury. And also the fact that that communicated to Sophia... Did she get any physical injury? No. That she doesn't... Those two nights. I'm sorry. She doesn't specify the physical harm to her that night. She was attacked numerous times and she specifically does allege, under a fair construction of her pro se complaint, that the repeated sustained inaction of Ralph Brown assigning that client involuntarily refusing to let Brown move away from that woman. That's involuntary, which is absolutely plaid in here. She could not move away from the woman that night. And in those circumstances, that the communication of you're being attacked, we know about it, we are not going to allow you to move, we are also sending the signal to Sophia and to others that we are indifferent to protecting you, is enough at this stage to suggest that there might be an implicit message of we're not going to enforce it. All right. Thank you. And we appreciate your taking on the assignment.